IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SUMIKO BESSER, | ) | Civ. No. 07-00437 BMK |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Sumiko Besser filed this action against Prudential Insurance Company of America to recover long-term disability ("LTD") benefits under the terms of an employee welfare benefit plan, Group Policy Number 9600 ("the Plan"), that Prudential administered.  Although Besser discontinued working due to various medical conditions and chronic neck pain, Prudential concluded that she is not "disabled" under the Plan and therefore denied her claim for benefits.  Besser contends she is disabled under the Plan and is entitled to recover LTD benefits from Prudential pursuant to the Employee Retirement Income Security Act ("ERISA").

After careful consideration of the evidence in the administrative record and the arguments of counsel, the Court concludes that Besser was disabled

at the time she stopped working, for the next 180 days, and for the following twenty-four months.  The Court does not now decide the amount of benefits Besser is owed for her disability; supplemental briefing on that issue is required before the Court awards damages.  The Court remands to Prudential the issue of whether Besser was disabled beyond the twenty-four month period.

FINDINGS OF FACT

Besser was an international vacation counselor, or timeshare real estate salesperson, for the Hilton Grand Vacations Company.  (PRU-BES[1] 826, 833.)  Due to various medical conditions that resulted in chronic neck pain, Besser ceased working on May 7, 2004.  (986.)  As a benefit of her employment at Hilton, Besser paid for LTD insurance coverage under the Plan.  (1-33.)  The Plan's language governs whether she is "disabled" and therefore entitled to LTD benefits.

A.    The Plan

Prudential is a fiduciary of the Plan and has a duty to operate the Plan prudently.  (38.)  Under the Plan, a beneficiary must be "disabled" throughout the "elimination period," which is 180 days, before benefits begin.  (12.)  The definition of "disability" changes after the elimination period:

---

[1] Each page of the administrative record, filed as Document No. 53, is bates-stamped with the prefix PRU-BES.  This Order omits the prefix when citing to the record.

During the elimination period, you are disabled when Prudential determines that:
- you are unable to perform the **material and substantial duties** of your **regular occupation** due to your sickness or injury;
- you are not working at any job; and
- you are under the regular care of a doctor.

After the elimination period, you are disabled when Prudential determines that:
- you are unable to perform the **material and substantial duties** of your **regular occupation** due to your sickness or injury;
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury; and
- you are under the regular care of a doctor.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(12.)

The Plan further defines "material and substantial duties," "regular occupation," and "gainful occupation":

**Material and substantial duties** means duties that:
- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if

3

you are working or have the capacity to work 40 hours per week.

**Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

**Gainful occupation** means an occupation, including self-employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work.

(13.)

The dispute in this case is whether Besser was disabled during the elimination period and throughout the following twenty-four months.[2] This Court must therefore determine whether Besser was (1) unable to perform the material and substantial duties of her regular occupation due to her injury, (2) whether she was not working; (3) whether she was under the regular care of a doctor; and (4) whether she had at least a 20% loss in indexed monthly earnings due to her injury. Because it is undisputed that she stopped working in May 2004, was continually under the care of a doctor since then, and had at least a 20% loss of earnings, in determining whether Besser was "disabled" under the Plan, the primary issue is

---

[2] As explained below, the Court remands to Prudential whether Besser was disabled beyond the twenty-four month period.

whether she was unable to perform the material and substantial duties of an international vacation counselor selling timeshares.

B.      Besser's Regular Occupation

On December 15, 2004, Hilton's Sales Administration Manager completed a form describing Besser's occupation as an international vacation counselor.  (833.)  The "general purpose" of her occupation is to "[g]enerate timeshare sales at designated sales sites including neighbor islands and Japan." (833.)  Her "essential duties and responsibilities" are to:

> Welcome clients, present product to potential buyers, sell vacation ownership at a high percentage rate, maintain effective communication with clients until sales is entered into [Hilton's] system, maintain guest contact as required, liaison with Quality Assurance Managers to resolve guest related issues, attend all sales training and sales meeting for key information on product and related updates, utilize selling concepts promoted at [Hilton], utilize various forms of communication (i.e., e-mail, telephone and written correspondence) to interface with guest and owners.

(833.)

In performing these essential duties, Besser must have the ability to read, analyze, and interpret technical journals, financial reports, and legal documents; respond to common inquiries or complaints of customers, regulatory agencies or members of the business community; and write speeches and

effectively present information to top management, public groups, and boards of directors.  (834.)  She is also required to have a current real estate license.  (837.)

In fulfilling her occupational responsibilities, Besser is expected to have the highest level of client interface, meaning daily and direct, face-to-face contact with clients.  (836.)  She is always expected to use advanced language skills to influence and persuade others, and to use high reasoning skills to make decisions and solve problems.  (837.)  She is frequently leading and mentoring others.  (837.)  Physically, Besser's occupation requires her to always talk and listen, and to frequently stand, walk, sit, reach with her hands and arms, and use her hands and fingers.  (838.)  She must frequently lift up to ten pounds and occasionally lift between ten and twenty-five pounds.  (244.)

In addition to Hilton's description of Besser's occupation as an international vacation counselor, Besser hired Teresa Manning to prepare a vocational evaluation report.  (841.)  The report explains that Besser's occupation is to sell high-end Hilton timeshare units to Japanese clients, which sold for $7,500 to $110,000 for one week of use each year.  (843-44.)  Manning notes that Besser typically worked Monday through Friday, and sometimes on Saturdays.  (844.)  Each day, Besser gave six tours of the Hilton's 23-acre property, and selling a

single timeshare would take approximately 5-6 hours.  (844.)  Besser also traveled

to Japan twice a year to meet clients in person.  (844.)

C.    Besser's Medical Condition

On April 1, 1996, Besser was in a motor vehicle accident, which

resulted in chronic neck pain, as well as right upper back pain with associated

numbness of the right middle and ring fingers.  (869, 872.)  At that time, she was

informed that x-rays of her neck showed a "reverse of curvature of the neck."

(869.)  In late 2001, she saw her treating physician, Dr. Bernard M. Portner, for

headaches in the right posterior neck area with associated dizziness and blurred

vision.  (869.)  Dr. Portner's impression was "probable cervical disc derangement."

(870.)

On November 12, 2001, a magnetic resonance imaging ("MRI")

examination was taken of Besser's cervical spine.  (902.)  The MRI showed

"degenerative changes are present at the C5-6 level."  (902, 875.)  Dr. Portner's

impression based on the MRI was "cervical disc derangement."  (875, 904.)

Besser sought medical treatment numerous times for neck pain

between 2001 and May 2004, when she quit working.  During that period, Besser

was diagnosed with cervical spine dysfunction, cervical disc derangement, lumbar

disc derangement, and thoracic spine dysfunction.  (875, 877, 880, 882-87, 889,

894.)  Degenerative changes, including "loss of height at C5-6 and C6-7," were also observed.  (878.)  Following her doctors' advice, Besser tried to alleviate her pain and discomfort with medication, chiropractic and acupuncture treatments, massage, yoga, and by using a home cervical traction unit.  (877, 882-88, 894, 963.)  Additionally, Besser underwent "cervical transforaminal selective nerve root injections at left C5, and C6 and C7" and "cervical facet joint injections at left C6-7 following medial branch blocks at left C7."  (892, 890.)  She was also advised to work fewer hours and to limit physical activity at work.  (886, 887, 888-89.)  When Besser felt better, she sought permission from her physicians to increase her work hours.  (889.)

May 7, 2004 was Besser's last day of work; she stopped working due to her chronic neck pain.  (986.)  According to Besser, she tolerated the pain for some time, but "just could not handle the pain anymore."  (826.)

Days after she quit working, Besser underwent "medial branch blocks at left C6, and C7" on May 12, 2004.  (897.)  Later that month, Besser visited Dr. Portner, "reporting that the neck pain is worse."  (898.)  Dr. Portner referred Besser to Dr. Dan W. Krushelnycky, a neurologist and interventional pain management specialist, who noted her left-sided pain.  (962.)  After undergoing a "left C6-7 facet block," Besser stated that the pain initially disappeared but slowly  returned

after a few hours.  (964, 654-55.)  Dr. Krushelnycky also performed a "medial branch block, posterior branches of C6 and C7 on the left" and he diagnosed her with "[p]ossible left C6-C7 facet arthropathy."  (656.)  Dr. Krushelnycky recommended Besser "stay off work until September 1, 2004."  (657.)

Besser saw Dr. William G. Obana, a neurosurgeon, on September 27, 2004.  (945.)  He examined her neck and reviewed her November 2001 MRI, which showed "neuroforaminal narrowing due to osteophyte" at the C6-7 level. (945.)  Dr. Obana concluded that Besser's "sensory changes are mostly in a left C7 distribution which would correlate well with the abnormality seen at C6-7 on her cervical MRI scan."  (945.)

On September 30, 2004, another MRI was taken of Besser's cervical spine.  (946.)  Dr. Portner's findings included "[d]ecreased disc space height . . . [at] the C6-7 level" and "mild bilateral facet hypertrophy" at the C4-5 level.  (946.) At a follow-up examination, Dr. Obana noted Besser's "chronic left neck pain and left upper extremity sensory changes," but stated "[i]t is difficult for me to treat her current symptoms to any specific abnormality on her cervical MRI."  (944.)  Dr. Krushelnycky similarly noted "MRI results inconsistent with clinical symptoms," but stated that he did "not believe that [Besser] misrepresented her pain" and

"never had a sense that [she] was trying to deceive me with regards to her symptoms." (661-62.)

On December 14, 2004, Besser informed Dr. Portner that her neck pain "has not changed much" and she felt worse with prolonged sitting, looking upward, walking fast, and walking up stairs. (901.) She also stated that her medication made reviewing and concentrating on legal documents very difficult. (901.)

Prudential retained Dr. Patrick M. Foye to review Besser's medical file without examining her. (866.) Dr. Foye concluded that Besser's medical records "do not support impairment that would preclude the performance of her own, regular occupation of time-share sales." (860.)

In April 2005, Besser met with Dr. Morris Mitsunaga, an orthopedic surgeon, for a surgical consultation. Based on her MRIs and x-rays, he concluded she has "[m]oderate degenerative disc disease C5-6 and C6-7 with spinal stenosis." (668.) He noted that Besser became tearful when talking about surgery and recommended she continue conservative treatment instead of surgery. (669.)

In June 2005, Besser met with Dr. Kenneth T. Kaan, another orthopedic surgeon. (670-71.) After reviewing her MRIs and x-rays, Dr. Kaan noted "[m]ultilevel degenerative disc disease of the cervical spine leading to axial

symptoms of posterior neck pain and proximal scapula pain on the right side."
(671.)  Dr. Kaan informed Besser that a fusion operation could be helpful for
cervical disc disease and axial-type symptoms.  (671.)

In July 2005, Dr. Craig H. Lichtblau, a physical medicine and
rehabilitation specialist, conducted a review of Besser's medical files without
examining her.  (685.)  Dr. Lichtblau observed that Besser "does have objective
evidence of diffuse and worsening cervical spondylosis, which is evident per the
serial MRIs of her cervical spine performed on 11/12/01 and the more recent MRI
of her cervical spine obtained on 10/1/04."  (685.)  Dr. Lichtblau stated, "it does
not appear that [Besser's] complaints are inconsistent with the objective cervical
MRI findings."  (685.)  Dr. Lichtblau's diagnostic impressions included:  diffuse
cervical spondylosis most prominent at the C4-5 and 5-6 levels, right occipital
neuralgia, cervical myofascial pain syndrome, cervical facet syndrome, focal right
paracentral disc protrusion at C4-5 with disc osteophyte complexes at C5-6 and
C6-7, and acute functional decline secondary to cervical spondylosis.  (685.)   Dr.
Lichtblau concluded:

> Given the description of her job duties and
> correlating it with the medical records, it is my medical
> opinion that she, more likely than not, would not be able
> to maintain gainful employment in her occupation as an
> international vacation counselor.  It should be understood
> that this patient suffers from chronic pain associated with

cervical spondylosis.  She will have good days and bad days and may frequently miss days of work on an unpredictable basis.  This, at best, makes her an unreliable employee.  Her activities as an international vacation counselor, which may include specifically very high stress situations, would exacerbate her symptomatology.  Her chronic pain may alter her ability to concentrate, reason, and speak intelligently.  She infrequently uses oral medicine, which may also alter her ability to concentrate and reason for unknown periods of time.

. . . . Given the job description provided to me, it is my medical opinion that she is not capable of returning to her prior occupation as an international vacation counselor.  Furthermore, I do not believe that she is capable of returning to work in any occupation involving real estate sales for the above reasons.

(686-87.)

On September 14, 2005, Prudential's in-house physician, Dr. Richard Day, conducted a file review of Besser's medical records.  (1081.)  Dr. Day noted Besser has "chronic cervical spine pain" and that her MRIs show mild degenerative changes.  (1081.)  Dr. Day concluded, however, that limitations to Besser's cervical range of motion and pain "would not prevent [her] from performing a sedentary occupation with accommodations," although he acknowledged that such accommodations would "not address the chronic pain problem."  (1081.)

Prudential conducted surreptitious surveillance of Besser on December 15-17 and 29-31, 2005 and videotaped a small portion of the

surveillance.  The video shows Besser walking, standing, sitting, bending over, and seated as a passenger in a vehicle, all while wearing a neck brace.  The video also shows that, on December 31, 2005, Besser went to the beach with her husband.  Although she was at the beach for approximately 2.5 hours, the video shows only a few minutes of her time there.  (394-95.)  On the video, she is not wearing a neck brace at the beach but is seen laying down with her head propped up on a pillow.  She is also seen sitting up, standing, swimming, and bending over, as well as turning her head to the left, right, and upward.

After the video surveillance was completed, Besser met with Prudential's orthopedic independent medical examiner, Dr. Peter Diamond.  Dr. Diamond examined Besser and found "tenderness to palpation at the left paracervical area, at over approximately C6-7 and at the left superior trapezius." (486.)  His impression of Besser's condition included "[m]ultilevel degenerative disc disease, cervical spine with right-sided focal paracentral disc protrusion at C4-5 and C6-7, posterior disc osteophyte complex, and mild neuroforaminal narrowing at C6-7."  (488.)  He observed "objective findings of cervical spondylosis on MRI," which Dr. Diamond noted "could be responsible for the complaints of pain and paresthesia."  (491.)  Notwithstanding his objective findings, Dr. Diamond concluded that they "do not support a level of chronic

functional impairment that precludes all work." (492.) He also stated that there "was no evidence of deliberate symptom magnification, no exaggerated pain response, and no evidence of malingering on today's examination." (492.)

Besser met with Dr. Gabriel W.C. Ma, an orthopedic surgeon, on January 20, 2006, for an independent medical evaluation. (414.) He examined her and reviewed her MRIs and x-rays. (418.) He diagnosed her with "[d]egenerative C4-5, C5-6, and C6-7 discs with osteophytic encroachment onto the intervertebral foramina greatest at C6-7, less so at C5-6, and minimally at C4-5." (418.) Dr. Ma concluded that, "[u]nless [Besser] does opt for surgery, it is not likely that she will be able to perform the substantial and material duties of her occupation as a vacation sales counselor." (419.)

In November 2006, Dr. Diamond reviewed the surveillance video and recent medical reports and prepared a supplemental medical report. (73.) "[B]ased on the video surveillance primarily," Dr. Diamond "disagree[d] with Dr. Ma's assessment that Ms. Besser is unable to perform the material duties of her occupation as a vacation sales counselor." (83.) Dr. Diamond also stated that, based on the surveillance video, "there is evidence of symptom magnification or, at the very least, a significant discrepancy between the evaluation on the date I saw her and the performance on the date of the video." (84.) He "emphasize[d] that

14

from the surveillance video, it appears that Ms. Besser is quite capable of normal function of the cervical spine for at least the time involved in the video." (85.)

Dr. Portner also reviewed the surveillance video. (159.) After reviewing it, he was "still of the opinion that Mrs. Besser is unable to work with reasonable continuity." (159.) He did not believe the video showed Besser doing activities that were inconsistent with her complaints or with her ability to work with reasonable continuity. (161.)

Although Besser suffered from chronic neck pain, some days were better than others. Indeed, she informed Prudential that, on the weekends, her husband would take her to the beach or shopping. (828.) Dr. Portner similarly noted that "sometimes she has good and bad days." (889.) Dr. Lichtblau also concluded that, based on her medical conditions, Besser "will have good days and bad days." (686.)

D.     Besser's Claim for LTD Benefits

Besser submitted her application for LTD benefits on November 9, 2004. (988.) Prudential denied her claim on January 27, 2005, concluding that Besser's "medical records do not support impairment that would preclude [her] from performing [her] regular occupation of time-share sales, including performing the associated paperwork, ambulation, and presentations." (318.) Besser appealed

15

that decision the next day, which Prudential denied on February 13, 2006.

(224-32, 690-791.)  Besser submitted a second appeal, which was denied on

December 5, 2006.  (162-215, 1002-06.)  Prudential upheld its earlier decisions,

stating, "Besser is physically and mentally able to perform the material and

substantial duties of her occupation as a Professional Salesperson as of her claimed

date of disability."  (1005.)

CONCLUSIONS OF LAW

Besser filed this action after Prudential twice affirmed its decision that

she is not "disabled" under the Plan.  In her Complaint, Besser claims she is totally

disabled and challenges the denial of her LTD benefits under ERISA, 29 U.S.C.

§ 1132(a)(1)(B).  Section 1132(a)(1)(B) authorizes a beneficiary to bring a civil

action "to recover benefits due to [her] under the terms of [her] plan [and] to

enforce [her] rights under the terms of the plan."

In deciding whether Besser is disabled under the Plan, this Court

reviews Prudential's decision under a de novo standard of review.  (Order Granting

Plaintiff's Request For De Novo Review at 14.)  Where de novo review applies,

"the court simply proceeds to evaluate whether the plan administrator correctly or

incorrectly denied benefits."  Opeta v. Northwest Airlines Pension Plan for

Contract Employees, 484 F.3d 1211, 1217 (9th Cir. 2007).  Stated differently,

16

because no deference is given to the plan administrator's decision under <u>de novo</u>

review, this Court must decide on its own whether Besser is disabled within the

meaning of the Plan.  <u>Id.</u> at 1215; <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084,

1095 (9th Cir. 1999).  In a trial on the record, this Court "evaluate[s] the

persuasiveness of conflicting testimony and decide[s] which is more likely true."

<u>Kearney</u>, 175 F.3d at 1095.  Besser carries the burden of proving she is disabled

under the Plan.  <u>Sabatino v. Liberty Life Assurance Co. of Boston</u>, 286 F. Supp. 2d

1222, 1232 (N.D. Cal. 2003).

The dispute at issue is whether Besser is "disabled" under the terms of

the Plan.  Besser is considered disabled during the elimination period and the

following twenty-four months if, among other things, she was unable to perform

the material and substantial duties of her regular occupation due to her medical

conditions.  (12.)  In determining whether she meets this standard, the Court

considers the reports of doctors who treated and/or reviewed her medical file, as

well as Besser's own subjective complaints.

The physicians who treated Besser and/or reviewed her records came

to different conclusions as to whether she could perform the material and

substantial duties of her occupation.  Drs. Portner, Lichtblau, and Ma opined that

her chronic neck pain and various cervical conditions precluded her from working

17

as an international vacation counselor.  (159, 419, 686-87.)  Their opinions were

supported by their own objective findings, as well as the objective findings by Drs.

Krushelnycky, Obana, Mitsunaga, and Kaan discussed above.  On the other hand,

Drs. Foye, Day, and Diamond concluded that she is able to perform the duties of

her occupation.  (492, 860, 1081.)  As explained below, the Court finds their

opinions less credible.

Dr. Foye reviewed Besser's medical records without examining her.

In supporting his conclusion that Besser can perform her job duties, Dr. Foye noted

her symptoms "did not correlate with any anatomic etiology, or did not correlate

with objective MRI findings."  (861.)  This statement disregards numerous

objective findings and medical reports in Besser's file, where other physicians

correlated her symptoms with MRI findings.  For example, Dr. Obana noted that

her pain "correlate[s] well with the abnormality seen at C6-7 on her cervical MRI

scan."  (945.)  Dr. Obana also interpreted Besser's November 2001 MRI as

showing neuroforaminal narrowing due to osteophyte at the C6-7 level.  (945.)

Additionally, Dr. Portner had noted that Besser's "MRI scan of the cervical spine

. . . showed degenerative changes at the C5-6 level," decreased disc space height,

and bilateral facet hypertrophy.  (875.)

Dr. Foye also emphasized "discrepancies" in Besser's complaints as to pain, noting that she previously reported pain on her right side and now "inconsistently" complains of pain on her left side. (863.)  But Dr. Foye failed to mention that Besser had continuously complained about pain on both sides of her neck and was specifically treated numerous times for discomfort on her left side. (654, 656, 890, 892, 897, 901, 944-45, 962, 964.)  For instance, days after she stopped working, she underwent "medial branch blocks at left C6 and C7."  (897.) Dr. Krushelnycky also performed a "left C6-7 facet block" and diagnosed her with "[p]ossible left C6-C7 facet arthropathy."  (654-56, 964.)  Given that Dr. Foye's file review overlooked objective findings in Besser's records and disregarded some of her symptoms and medical procedures, the Court finds that Dr. Foye's report lacks credibility.

Dr. Day also reviewed Besser's medical file.  His summary of her medical history is less than two pages and lacks detail.  (1080-81.)  Although he noted that Besser's MRIs showed degenerative changes, he concluded that she could perform a sedentary occupation with accommodations.  (1081.)  There are two problems with this conclusion.  First, Dr. Day expressly acknowledged that the accommodations would "not address the chronic pain problem."  (1081.)  Because Besser stopped working due to her chronic pain, and given Dr. Day's own

19

conclusion that she *does* have "chronic cervical spine pain," it is unclear how such accommodations would enable her to work through the pain. Second, in reasoning that Besser is able to perform her occupation, Dr. Day states her pain "has been present for years and [she] was able to maintain work activities." But Besser had been routinely following her doctors' advice to work reduced hours or to stay home from work altogether. Dr. Day makes no mention of Besser's reduced work schedule. Thus, Dr. Day's assessment is incorrect to the extent he claims Besser could work continuously with her chronic neck pain. (1081.)

Moreover, Dr. Day focuses on Dr. Foye's conclusion that Besser's symptoms are inconsistent with her MRIs. (1080.) As explained above, that conclusion failed to consider other physicians' opinions which *did* correlate Besser's symptoms with her MRIs and x-rays. Dr. Day also refers to Dr. Mitsunaga's surgical consultation, but fails to mention he correlated Besser's degenerative disc disease with her MRIs and x-rays. (668.) Dr. Day's omissions reflect that he did not have a full understanding of Besser's medical conditions and their effects on her. The Court therefore finds that his conclusions lack credibility.

In contrast with Dr. Day's medical report, Dr. Diamond's reports are excellent in detailing the progression of Besser's degenerative disc disease. He also examined Besser himself and documented all of her medical examinations and

procedures since 2001.  Dr. Diamond also summarized objective findings made by other physicians and made his own such findings, including:  tenderness to palpation at the left paracervical area, limited range of motion with neck extension and left sided flexion, delayed sensory responses in fingers, positive Tinnel's sign bilaterally at the carpal tunnel, and asymmetric strength in biceps, opponens pollicis, and grip.  (486-87.)  His observations of Besser are consistent with functional limitations caused by multi-level degenerative disc disease.  Indeed, he found "Besser has objective findings of cervical spondylosis on MRI," which "could be responsible for the complaints of pain and paresthesia."  (491.)  He also noted that, upon examining her, there was "no evidence of symptom magnification" or "exaggerated pain responses."  (492.)

Although Dr. Diamond's observations of Besser and his objective findings support the conclusion that she is unable to perform the duties of her occupation, he nevertheless concluded that her condition does not "preclude[] all work."  (492.)  He gave great weight to the surveillance video, expressly stating his opinion was "based on the video surveillance primarily."  (83.)  The Court concludes, however, that the video should be given little weight in determining whether Besser was disabled.  First, the only portion of the video that shows Besser moving her neck is the holiday beach scene.  It is no surprise, however, that Besser

went to the beach, as she openly informed Prudential that her husband would take her to the beach or shopping on the weekends if she felt up to it.  (828.)  Second, the video recorded Besser's activities for only minutes at a time and shows, as Dr. Diamond concedes, that she capable of normal function for "the time involved in the video."  (85.)  Besser was in pain most of the time, but admittedly had good days and bad days.  She never stated she was debilitated twenty-four hours a day, and the video documents the pattern of ups and downs typical of degenerative disc disease.  The bits of video showing her move fluidly does not support a conclusion that she can function normally and perform her job duties for "40 hours per week."  (13.)  The Court therefore gives little weight to the video, as well as Dr. Diamond's conclusions based on the video.  But for his reliance on the video, Dr. Diamond's reports support a finding of disability.

In addition to Besser's medical records, the Court also considers Besser's subjective complaints of pain.  According to Besser, her neck pain progressively worsened until she "just could not handle the pain anymore."  (826.)  At that point, she stopped working.  (986.)  Besser was in pain most of the time, with her pain ranging between "6-8/10 but at times . . . up to 9/10."  (668, 987.)  However, she had good days and bad days and even asked for permission to increase her work hours when she felt better.  (889.)

Prudential claims that Besser exaggerated her disability so that she could collect LTD benefits instead of working as a vacation counselor. But at the time Besser applied for benefits, she fully expected to return to work within eight months and did not plan on collecting LTD benefits forever. (986.) The real estate boom in Hawaii had just begun and continued to grow for years after May 2004, so a decision to quit her lucrative occupation in the middle of a booming market to instead collect LTD benefits makes little sense. Additionally, Drs. Krushelnycky, Portner, and Diamond did not believe Besser misrepresented her pain when they examined her, (161, 492, 662), and she even asked to increase her work hours when she felt better. Accordingly, the Court disagrees with Prudential that the surveillance video or Besser's alleged desire to retire tarnish her credibility.

Given the physicians' objective findings, as well as Besser's credible complaints of chronic neck pain, the Court concludes that Besser was unable to perform her regular occupation as an international vacation counselor during the elimination period and the following twenty-four months. Her regular occupation required her to sell a high percentage of timeshares, maintain constant contact with clients, and review complicated legal and real estate papers. Any timeshare salesperson is expected to frequently walk on tours and move from the sitting to standing position. Besser's occupation also required her to talk on the phone and

use the computer.  All of these activities exacerbated her chronic neck pain and she

eventually could no longer perform the duties of her job.  As it is undisputed that

she stopped working altogether, was under the regular care of a doctor for her neck

pain, and had at least a 20% loss of earnings, Besser satisfies her burden of

establishing she was disabled during the elimination period and the following

twenty-four months.  Sabatino, 286 F. Supp. 2d at 1232.

In light of the foregoing, Besser is entitled to LTD benefits for the

first twenty-four months following the elimination period.  (12.)  The Court agrees

with Besser's position at trial that the Court, at this time, refrain from deciding the

amount of benefits she is owed.  Supplemental briefing on that issue is necessary

for the Court to make an informed decision on a damages award.  Unless the

parties reach an agreement on the amount of benefits owed, Besser shall file a brief

on the issue by August 17, 2009.  Prudential's opposition brief is due August 28,

2009, and Besser may file a reply brief by September 15, 2009.  The Court will

decide whether to hold a hearing on the matter after reviewing the briefs.

The Court remands to Prudential the issue of whether Besser is

entitled to benefits beyond the twenty-four month period, as Prudential did not

address that issue in the first instance and because the record does not adequately

address her medical condition since then or information on any "gainful

occupation" for which she is reasonably fitted by education, training or experience.

See Patterson v. Hughes Aircraft Co., 11 F.3d 948, 951 (9th Cir. 1993) ("the case

[is] remanded to the plan administrator for a finding and further proceedings

consistent with this opinion"); Henry v. Home Ins. Co., 907 F. Supp. 1392, 1399

(C.D. Cal. 1995) (remanding case to plan administrator).

DATED:  Honolulu, Hawaii, July 11, 2009.

IT IS SO ORDERED.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Sumiko Besser v. Prudential Insurance Company of America, CV. 07-00437BMK; FINDINGS OF FACT AND CONCLUSIONS OF LAW.

25